## THE MARYLAND TRUST COMPANY *vs.* THE NATIONAL MECHANICS BANK—JOHN SOLTER ET AL. *vs.* THE SAME.

*Purchase by a Corporation of its Own Shares of Stock—Illegal Reduction of Capital Stock—Contracts Against Public Policy—Loan of Money by Bank for Purchase by a Trust Company of its Own Stock—Ultra Vires—Recovery of Money Loaned for Illegal Purpose—Power of Directors of a Corporation—Notice to Officers of Corporation—National Banks.*

When the immediate consequence, or the direct object, of a contract is the doing of an illegal act, the contract is void, although the intention of the parties may be innocent.

The amount of the capital stock of a corporation cannot lawfully be diminished in any other mode than that prescribed by Code, Art. 23, secs. 82 to 87.   A purchase by a trust company of its own shares of stock is an illegal reduction of the capital stock.

No one except the Government itself can take advantage of a violation of sec. 5200 of the Revised Statutes of the United States, which prohibits a national bank from lending to any person or corporation more than ten per cent of the bank's capital.

In the absence of express authority, a corporation, the amount of whose capital stock is fixed in its charter, has no power to purchase its own shares, either for the purpose of holding or selling them, or for the purpose of cancelling and retiring them.

A corporation has no authority to release subscribers to its capital stock from paying the amount due on their subscriptions, because that is a trust fund for the creditors of the corporation,   It follows that after the shares have been paid up the corporation cannot by purchasing them itself reduce the amount of capital stock.   And this rule is especially applicable to a trust company whose shareholders are personally liable to creditors for double the amount of their holdings of stock.

Notice to the officers of a bank acting as such is notice to the bank.

When a lender knows that the money borrowed is to be used for an illegal purpose, and it is a part of the contract between the parties that the money shall be used for that purpose, and the lender participates in such use, then the contract of loan is illegal, and there can be no recovery of the money loaned.

A contract by which a party lends money to a trust company to be used, with the knowledge and assistance of the lender, in buying its own shares of stock is illegal and the money so loaned cannot be recovered.

Officers of the Maryland Trust Company sought to acquire the Guardian Trust Company by the exchange of one share of the stock of the former company for two shares of the stock of the latter. In order to maintain and increase the market price of the stock of the Maryland Trust Company a contract was made by it with a bank by which the bank purchased through its own agents shares of the trust company's stock and advanced the money therefor. The transaction took the form of obligations to the bank from employees of the trust company, guaranteed by it. The object of the purchase of the shares was known to the officials of the bank, and was authorized by the executive committee of the trust company. After a large number of shares had been bought, the trust company went into the hands of receivers and the bank claimed to be allowed as a creditor the sum so expended in buying the trust company's stock, which shares remained in the possession of the bank. Under the statute law of the State the shareholders of the trust company were liable to creditors for double the amount of their holdings ; and the method prescribed by Code, Art. 23, sec. 82, for diminishing the stock of a corporation is the only lawful mode of doing so. *Held*, that the contract between the trust company and the bank was against public policy and illegal, because, (1) it involved in its execution an unlawful reduction of the amount of the trust company's capital stock ; (2), it destroyed the double liability attached to the share holders whose stock was purchased ; (3), it was a contract which the executive committee of the trust company had no power to make ; (4), it was a contract which tended to deceive the public, and especially the holders of the Guardian Trust Company, as to the real value of the stock of the Maryland Trust Company and to produce a fictitious value on the Stock Exchange of the latter stock, and that consequently the bank is not entitled to recover the sums advanced by it for the purchase of the shares of stock, but these shares belong to the bank.

A Board of Directors of a corporation has authority to delegate to subordinate officers, or to a committee of their number, the power to perform any act in the course of the business of the corporation, which they themselves can legally perform, provided there is express authority given therefor, or it is implied from usage or from the necessities of the management of the corporation.

Appeal from Circuit Court No. 2, of Baltimore City (BAER, J.)

The cause was argued before McSHERRY, C. J., BRISCOE, BOYD, PEARCE, JONES and BURKE, JJ.

*William L. Marbury* and *Frank Gosnell* for the Md. Trust Co., appellant.

*John F. Williams* and *E. P. Keech, Jr.*, (with whom were
*A. H. Taylor, George A. Solter* and *J. Pembroke Thom* on the
brief) for John Solter and other stockholders of the Md. Trust
Co., appellant.

*Randolph Barton* and *Edgar H. Gans* (with whom was
*James M. Ambler* on the brief) for the appellee.

McSherry, C. J., delivered the opinion of the Court.

These are appeals from an order passed by Circuit Court
No. 2 of Baltimore City on July the thirty-first nineteen hun-
dred and five. By that order certain exceptions filed by the
Maryland Trust Company and also by several shareholders of
that company against the allowance of a claim preferred by the
National Mechanics Bank, of Baltimore, were overruled, and
the Receiver of the Trust Company was ordered to pay the
claim out of any assets of the Trust Company in his hands
after the payment in full of the claims of all other creditors of
the Trust Company. From that order both the Maryland
Trust Company and the objecting shareholders have appealed.
The questions involved are numerous and important, and the
amount of money at stake is large. The record and the briefs
are voluminous ; and the cases have been argued with marked
ability, and we have given to them a patient and careful con-
sideration. Before stating or discussing the questions which
are before us, a brief outline of the material facts must be
given—and this we now proceed to do.

By an Act of the General Assembly of Maryland, approved
on March 29th, 1894, being chapter 164 of the Acts of
the January Session of that year, the Maryland Trust Com-
pany was incorporated. It was duly organized and began
business under and pursuant to its charter. In March, 1901,
a merger of the Guardian Trust Company in the Maryland
Trust Company was proposed and its accomplishment was
undertaken by Mr. John B. Ramsay for a consideration of one
hundred thousand dollars to be paid to him by the Maryland
Trust Company.

The basis upon which the merger was to be effected was the exchange of two shares of Guardian Trust Company stock for one share of Maryland Trust Company stock, that ratio being adopted because it was considered that a share of the last-named company's stock was worth as much as two shares of the Guardian Trust Company's stock. In a short while Mr. Ramsay secured at least sixty per cent of the Guardian Trust Company's shares for exchange under the merger agreement, and was paid his stipulated fee of one hundred thousand dollars. There were, however, left outstanding quite a number, approximately, four thousand of Guardian Trust shares, the owners whereof seemed indisposed to go into the merger scheme because they believed the value of the Maryland Trust Company shares was not equal to double the value of the Guardian shares; and this belief had its origin in the fact that the market values of the respective shares did not show a ratio of two to one. A further disturbing element made its appearance on March 23rd in the shape of an offer by Hambleton & Company, published in "The Sun" of that day, to pay one hundred and ten dollars a share for the Guardian Trust stock, provided a majority of the stock of that company was deposited with them by the first of April, 1901. On March 23rd Maryland Trust Company stock was selling at two hundred and five dollars a share, though three days before, it brought two hundred and fourteen dollars per share. The officers of the Maryland Trust Company were anxious to get in all the shares of the Guardian Trust Company, and when this "obstacle" and "hitch in the deal," occasioned by the want of parity in the market value of the two stocks and the depression in the Maryland shares confronted them, they applied to Mr. Ramsay (whose contract to secure a majority of the Guardian Trust Company's stock had then been executed and completed) with a view of procuring aid to buy and carry the amount of Maryland Trust stock necessary to overcome the raid being made by Hambleton & Company. "We approached Mr. Ramsay on the matter," so Mr. Scott testified, "and he was perfectly willing to do as we suggested, and, in fact,

thought it a very wise proceeding, but said that he could not lend the Maryland Trust Company enough money to buy the stock, and the obligations would have to be given in somebody else's name, with the Maryland Trust Company as guarantor." At that time Mr. Ramsay was, and still is, the president of the National Mechanics Bank, and when the application was made to him to buy and carry the Maryland Trust Company's stock, so as, by that means, to raise and maintain the apparent market price thereof in order thereby to influence the outstanding holders of the Guardian Trust Company's stock to part with their shares on the basis fixed in the merger agreement, he was approached, not individually, but as the representative of a bank and the transactions which immediately ensued brought the Mechanics National Bank into the negotiations for the first time. As soon as the proposal to go upon the stock market and buy up shares of the Maryland Trust Company for the Maryland Trust Company for the purpose indicated, was suggested to and approved of by Mr. Ramsay, he proceeded to carry out the plan through a broker with whom he had been formerly associated as partner and also through other firms of brokers. As the stock of the Maryland Trust Company was bought, the bills in most instances were made out in the name of the Mechanics Bank as purchaser and upon presentation of the bills to the bank accompanied by the shares, transferred in blank, they were paid generally, if not invariably, by checks of the bank's cashier. The shares were treated as cash items until a considerable amount expended in their purchase had accumulated, and then a receipt, to escape the payment of the revenue tax, subsequently changed to a note of, and signed by, some employee of the Maryland Trust Company was given to the bank for that amount, and was guaranteed by the Maryland Trust Company and the shares of stock so purchased were pledged, at the market value paid for them, as collateral security. This process was repeated and carried on until the bank had paid out for thirteen hundred and eleven shares of the Maryland Trust Company's stock sums which, with interest added, now

aggregate two hundred and eighty-five thousand, seven hundred and sixty-three dollars and forty-eight cents. This is the claim which the bank now seeks to have repaid out of the assets of the Maryland Trust Company in the hands of its receiver. There is no doubt that the trust company was entirely solvent when these transactions took place, but, from other causes, it was placed in the hands of a receiver in October, 1903. The company itself and its stockholders resist the payment of this claim upon several grounds, the more important whereof are the only ones we need consider or determine.

The *form* in which the transactions with the bank were couched excluded, on its face, the theory that the trust company was primarily liable to repay to the bank the sums advanced by the latter for the purchase, in the open market, of the stock of the former; because the receipts later on replaced by the notes given to the bank for the amounts so advanced were the promissory notes, not of the trust company, but of three employees of the trust company, and the liability of that company on those notes was the liability of a guarantor, and therefore purely a secondary obligation. The books of the bank do not show an entry of any kind indicating that the trust company was an original debtor to the bank on account of these advances. The form in which these dealings were thus put was adopted with the distinct and avowed view of avoiding an open and apparent infraction of *Sec. 5200* of the Revised Statutes of the United States which prohibits a national bank from lending to any person, company, corporation or firm more than ten per cent of the bank's capital. But waiving these preliminary objections and treating the trust company as the primary debtor to the bank it is settled by repeated decisions of the Supreme Court that no one except the government itself can take advantage of a violation of *Sec. 5200, Union Mining Co.* v. *Rocky Mt. Bk.*, 96 U. S., 640, and we are then brought to a consideration of the more serious and substantial difficulties which confront the bank in its efforts to get reimbursement for these advances from the assets of the trust company.

The trust company and its stockholders resist the demand of the bank on the ground that the contract entered into between Mr. Ramsay in behalf of the bank, and the officers of the trust company, in behalf of that institution, is both illegal and *ultra vires*, and it is insisted that the contract is illegal and *ultra vires*, first, because it contemplated and provided for a "rigging" of the stock market; secondly, because the purchase for the trust company of the shares bought pursuant to the terms of the contract withdrew from its creditors and depositors and the remaining shareholders the protection afforded by the double liability imposed upon the owners of its stock by the express provisions of its charter; and illegally reduced the amount of the capital stock; thirdly, because, the executive committee, if it even did direct the officers of the trust company to enter into the contract—which is denied—had no power or authority to give such direction; fourthly, because treating the advances as direct loans by the bank to the trust company, the lender made it a part of the contract of lending and borrowing that the money so lent should be used for the illegal purpose of a purchase by the trust company of its own capital stock, and therefore the bank participated in the illegal design and its execution and actually itself applied the money towards the accomplishment of that purpose.

*Ultra vires* and illegality represent totally different ideas. *Bissell* v. *R. R.*, 22 N. Y. 269. *Ultra vires* contracts are strictly speaking, only those which are defective solely because they are beyond the power of the corporation; when they involve some adventure or undertaking not within the scope of the charter, which is the rule of its corporate action. *Leslie* v. *Lorillard*, 110 N. Y. 519; S. C. 1, L. R. A. 456. If the contract is illegal as in violation of established principles of public policy, it cannot, of course, be enforced, 2 *Page on Con.*, sec. 1084, and the like result will follow if the contract is repugnant to the Code. We have had occasion, quite recently, in the case of the *Western Maryland Railroad Company* v. *The Blue Ridge Hotel Company*, decided in December, 1905, *ante* p. 307, to go into a consideration of the doctrine of

*ultra vires* and to point out in an elaborate and carefully prepared judgment delivered by JUDGE PEARCE, the limitations upon and qualifications of that doctrine as affected by the circumstance that a contract is executory and not an executed one, and we need not now repeat what was there so well and lucidly stated.  If the contract we are dealing with in this case is open to the objection of being both *ultra vires* and illegal the discussion will be greatly abbreviated by omitting all reference to the *ultra vires* feature as a distinct ground of invalidity, and by confining ourselves to a consideration of the alleged illegality.  The discussion will be shortened by putting aside the mere *ultra vires* character of the contract, because a contract simply *ultra vires* is not necessarily unenforceable—it may be enforced under certain conditions—and, hence, before it can be stricken down on that ground alone, all the conditions under which it may be upheld must be eliminated, and to exclude them all would involve a prolonged examination and analysis of numerous facts and a minute application of many legal principles, none of which need be alluded to at all, if the contract is void by reason of its illegality.  In the view we take of the case we will not be required to consider separately the first of the four grounds mentioned above, because if the contract upon which the bank relies to support its claim is illegal for or on account of any of the other reasons assigned, it cannot be enforced, and there will be no occasion to discuss the features concerning "rigging the market."  The second and fourth grounds being closely akin and to some extent interwoven with each other, will be treated together.  The contract, though heretofore outlined, must now be somewhat more particularly stated so that the relevancy of the comments which will be made upon it may be apparent.  Put in the simplest and plainest form the contract provided, that the bank was to furnish the money necessary to enable the Maryland Trust Company to have its own stock purchased on the Stock Exchange through agents who would not disclose the fact that they were buying for the trust company, in order to create the impression upon the

public and particularly in the minds of the holders of the minority of the Guardian stock, who had indicated an unwillingness to exchange their shares for Maryland Trust stock, that there was a demand for the Maryland Trust stock in excess of what the real demand was, and thereby to bring the Guardian stockholders in, and to hold the market against the anticipated Hambleton raid. The further effect of the contract was to reduce, by the number of shares purchased under it, the capital stock of the Maryland Trust Company and to withdraw from its creditors and depositors and the remaining shareholders the protection of the double liability clause of the statute, to the extent of over two hundred and sixty thousand dollars. Can such a contract be enforced? Assuming now that the Maryland Trust Company authorized that contract to be entered into, is it a legal contract?

Obviously it was, as to part of its subject-matter, a contract to do something which was calculated to mislead the public and especially to induce the minority shareholders of the Guardian Trust Company (who had not gone into the merger because of the inequality in the market value of the shares of the two companies at the ratio of the proposed exchange) to believe that there was a demand for the Maryland Trust stock at a price nearly equal to twice the value of the Guardian stock, whereby those minority shareholders would be influenced, and undoubtedly were prevailed on, to surrender their shares in exchange for Maryland Trust shares which have now turned out to be much less valuable. As to the rest of its subject-matter, it was a contract which, in its performance, caused a reduction of the capital stock of the Maryland Trust Company in an illegal way, and destroyed *pro tanto* the double liability imposed upon the company's shareholders by the law of the company's being. In these latter particulars the contract was an illegal one.

Whilst the gentlemen who were concerned in this transaction never dreamed for a moment that they were engaged in an undertaking which was unlawful because in the teeth of a general statute, and plainly subversive of a sound and virile

public policy as herein later on pointed out; and whilst a purpose to do wrong was never in the most remote way contemplated by any of them; still men are held by the law, generally to have intended the natural, and always to have intended the necessary, immediate and inevitable consequences of their voluntary acts; and however innocent their motives may have been, they must be treated, when their conduct and contracts are being dealt with in such proceedings as the one before us, precisely as though they designed to accomplish the results which necessarily, immediately and inevitably flowed from what they deliberately did, pursuant to a contract to do the thing so done. A corrupt intent is not necessary. 15 *Am. & Eng. Ency. L.*, 936. It is common knowledge that fictitious values are given to investment securities by the method resorted to in this instance, but the prevalence of the method does not sanction its employment nor alter its impropriety, though perhaps it may account for the adoption of such an expedient by persons who would, but for its general use, be the least apt to have recourse to it. "I am quite aware," said LINDLEY, L. J., "that what the plaintiff has done is very commonly done; it is done every day. But this is immaterial." *Scott* v. *Brown*, 2 Q. B. (1892), 724.

The discussion which we now approach involves the following inquiries: Was the reduction of the Maryland Trust Company's capital stock by the purchase for it of its own shares under the contract alluded to lawful; and was the extinguishment by that method of the stockholders liability to the extent of the responsibility represented by the purchased shares, consonant with a sound, healthy, public policy? The Code of Public General Laws in *Art. 23, secs. 82 to 87*, both inclusive, makes distinct and minute provisions relative to the method to be followed when the amount of the capital stock of a corporation is to be diminished. The fact that the Legislature has prescribed a particular mode to be pursued for the accomplishment of such a result necessarily excludes the right to resort to any other or different method. Those sections enact that public notice published for at least four suc-

cessive weeks must be given that a meeting of the shareholders will be held to determine whether the capital shall be diminished, and that if the shareholders owning at least two-thirds of the whole stock shall at such meeting decide to reduce the amount of the capital, a certificate in due form shall be made out, sworn to and recorded where the principal office of the corporation is located.   That is the only lawful way in which the amount of the capital stock could be diminished. Did the purchase by the bank for the trust company of thirteen hundred and eleven shares of the latter's capital stock constitute an unauthorized—that is, an illegal—reduction of the stock to the extent of the shares so purchased?   That inquiry is satisfactorily answered by *Mr. Morawetz, in sec. 112 (2 ed.), of his work on Corporations,* in these words: "A purchase by a corporation of shares of its own stock, in effect, amounts to a withdrawal of the shareholder whose shares are purchased, from membership in the company, and a repayment of his proportionate share of the company's assets.   There is no substitution of membership under these circumstances as in case of a purchase and transfer of shares to a third person, but the members of the company and the amount of its capital are actually diminished.   Whatever a transaction of this character may be called in legal phraseology, it is clear that it really involves an alteration of the company's constitution, just as the withdrawal of a member of a co-partnership, with his proportionate share of the joint funds, involves an alteration of the constitution of a co-partnership.   The amount of the company's assets and the number of its shareholders, are diminished; every continuing shareholder is injured by the reduction of the fund contributed for the common venture; and the creditors, who have trusted the company upon the security of the capital originally subscribed, or who are entitled to expect that amount of security, are entitled to complain.   It is no answer to say that shares having a market value must be regarded like any other personal property, and that no person is injured if a solvent corporation in good faith purchases shares in itself at their market value, inasmuch as

the shares so purchased are property in the hands of the company, and may at any time be re-sold or sold.    No verbiage can disguise the fact, that a purchase by a corporation of shares in itself really amounts to a reduction of the company's assets, and that the shares purchased do in fact remain extinguished, at least until the re-issue has taken place.    The fact that such a transaction may not necessarily be injurious to any person is not a sufficient reason for supporting it.    It is contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy.    To allow the directors to exercise such a power would be a fruitful source of unfairness, mismanagement and corruption.    It is for these reasons that a shareholder cannot be allowed to withdraw from the corporation with his proportionate amount of capital, either by a release and cancellation before the shares have been paid up, or by a purchase of the shares with the company's funds."

The questions we are now considering have not been directly decided in Maryland and we may, therefore, be justified in citing somewhat at length from adjudications in other jurisdictions on this subject.    As some of the cases to which we will allude bear upon the inquiries both as to the effect of a purchase by a corporation of its own stock, and the effect of such a purchase when the stockholder is burdened with a superadded statutory liability, it will be appropriate at this point to advert to the *status* of the Trust Company's shareholders as respects that statutory-liability.    By the *Act of 1892, ch. 109, sec. 85L*, which related to Safe Deposit, Trust and Guaranty Companies, it was provided that "each stockholder shall be liable to the depositors and creditors of any such corporation for double the amount of stock at the par value held by such stockholder in such corporation." By the *15th sec.* of the charter of the Trust Company, the corporation was made "subject at all times to the provisions of the *Act of 1892, ch. 109.*"    The constitution of the State in *Sec. 39, Art.* 3, declares that "the General Assembly shall grant no charter for banking purposes, nor renew any bank-

ing corporation now in existence, except upon the condition that the stockholders shall be liable to the amount of their respective share or shares of stock in such banking institution for all its debts and liabilities. Turning now to the case of *Coffin* v. *Greenless & Ransom Co., 38 Ohio St. 275* we find an adjudication precisely in point. We quote somewhat at length because the reasoning seems to be both cogent and apposite. "The power of a trading corporation," said the Court, "to traffic in its own stock, where no authority to do so is conferred upon it by the terms of its charter, has been a subject of much discussion in the Courts ; and, the conclusions reached by different Courts, have been conflicting. Of course, cases wherein the power is found to exist by express or implied grant in the charter, furnish no aid in the solution of the question before us ; unless the claim of the plantiff can be sustained, that such power was conferred on the defendant by section 63 of the Corporation Act of 1852, as amended, which confers on manufacturing corporations the powers enumerated in section 3 of the Act, and, among others the power to acquire and convey at pleasure, all such real and personal estate as may be necessary or convenient to carry into effect the object of the corporation. We think, however, that this claim cannot be maintained. The sole object of the defendant corporation was 'for manufacturing purposes;' and it cannot be said in any just sense, that the power to acquire or convey its own stock was either necessary or convenient 'for manufacturing purposes'.

"The doctrine that corporations, when not prohibited by their charters, may buy and sell their own stocks, is supported by a line of authorities ; and prominent among them may be mentioned the cases of *Dupee* v. *Boston Water Power Co.* 114 Mass. 37 and *C. P. & I. R. R. Co.* v. *Marsailles*, 84 Ill. 145. But nevertheless we think the decided weight of authority, both in England and the United States, is against the existence of the power unless conferred by express grant or clear implication. The foundation principle upon which these latter cases rest, is that a corporation possesses no

power except such as are conferred upon it by its charter either by express grant or necessary implication ; and this principle has been frequently declared by the Supreme Court of this State ; and by no Court more emphatically than by this Court. It is true, however, that in most jurisdictions where the right of the corporation to traffic in its own stock has been denied, an exception to the rule has been admitted to exist, whereby a corporation has been allowed to take its own stock in satisfaction of a debt due to it. This exception is supposed to rest on a necessity which arises in order to avoid loss. * * * * But however that may be, the right of a corporation to traffic in its own stock, at pleasure, appears to us to be inconsistent with the principle of the provisions of the present Constitution. Article 13, sec. 3, which reads as follows : 'Dues from corporations shall be secured by such individual liability of stockholders, and other means, as may be prescribed by law; but in all cases each stockholder shall be liable over and above the stock by him or her owned, and any amount unpaid thereon, to a further sum, at least equal in amount to such stock.' Now, it is just as plain that a business or trading corporation cannot exist without stock and stockholders, as it is that creditors of such corporation are entitled to the security named in the constitution. *State, ex. rel. Atty.-Gen.* v. *Sherman,* 22 Ohio, St. 411. . The corporation itself cannot be a stockholder of its own stock within the meaning of the provision of the constitution. Nobody will deny this proposition. And if a corporation can buy one share of its stock at pleasure, why may it not buy every share? If the right of a corporation to purchase its own stock at pleasure exists and is unlimited, where is the provision intended for the benefit of creditors? This is not the security to which the constitution invites the creditors of a corporation. I am aware that the amount of stock required to be issued is not fixed by the constitution or by statute, and also that provision is made by statute for the reduction of the capital stock of corporations; but of these matters creditors are bound to take notice. They have a right

however to assume that stock once issued, and not called back in the manner provided by law, remains outstanding in the hands of the stockholders liable to respond to creditors to the extent of the individual liability prescribed.    In this view it matters not whether the stock purchased by the corporation that issued it, becomes extinct or is held subject to be re-issued.    It is enough to know that the corporation as purchaser of its stock does not afford to creditors the security intended.    And surely, if the law forbids the organization of a corporation without stock, because the required security is not furnished, it cannot be that having brought the corporation into existence it invests it with power to assume at pleasure, the identical character or relation to the public, that was an insurmountable objection to the giving of corporate existence in the first place.  *   *   *    The general law of the State, of which all persons are presumed to have knowledge, is the source and limit of all its powers and duties; and these cannot be varied either by usage or contract.    The doctrine of estoppel has no application in the case."    In *Crandell* v. *Lincoln*, 42 Conn. 99, where the capital of a corporation was diminished by the purchase of its own shares, it was held that, "The statute fixing the minimum number of shares and their par value determined as far as practicable the minimum value of the capital stock, and it was clearly the intention of the Legislature that it should be no less.    The number of shares therefore, could not be reduced, and the value of all the shares diminished, except by legislative authority.    If the trustees could purchase stock with the capital of the corporation, they could of their own authority reduce the number of shares and correspondingly diminish the aggregate value of all shares.  *   *   *    The statute forbidding the-company to make dividends payable from the stock" (and we have such a statute in Maryland, Code, Art. 23, sec. 75) "and to loan money upon a pledge of its stock, by necessary implication forbids the company from purchasing its own stock.    The provision that the company may have a lien upon the stock as security for any debt due from the owner is not in conflict with this

view of the statute. Such lien does not contemplate that the company may become the owner of the stock. It contemplates rather that the lien shall be enforced, like any other lien, by a sale of the stock, the purchaser being substituted for the delinquent stockholder.

"Where it is provided by law that each stockholder, in case of insolvency, shall be liable to contribute a sum equal to the nominal value of his stock, there is an obvious reason why the company cannot become a stockholder. If it may, it withdraws from the fund designated to secure creditors a sum equal to the nominal value of the stock so owned. * * * Our conclusion is that the capital stock of the company being impaired when the stock in this case was purchased, and the stock in each case having been paid for from the capital, the transaction was illegal and cannot be sustained."

The case of *Trevor* v. *Whitworth*, 12 App. Cases, 409, is full upon the proposition that a corporation cannot traffic in its own stock or reduce its capital stock by purchasing its own shares. In the course of the learned judgment delivered by LORD HERSCHELL he referred to the case of *Hope* v. *International Financial Society*, 4 Ch. Div. 327, where it appeared that a company having 150,000 shares issued, passed a special resolution that the directors should have power to apply the company's assets to purchase from shareholders willing to sell any number of shares not exceeding 100,000, and that such shares should not be re-issued by the directors without the authority of a general meeting. "The Court of Appeals" said LORD HERSCHELL, "affirming VICE-CHANCELLOR BACON held that this scheme was invalid." LORD JUSTICE JAMES in the *Hope case* said: "Either this is a purchase of shares in the sense of trafficking in shares, which is a purchase not authorized by the memorandum of association, or it is an extinguishment of the shares, and therefore a reduction of the capital of the company." And LORD ESHER observed: "I agree with the Lord Justice that the dilemma is made perfect; for if you assume that there was to be a re-issue of these shares, the shares are not cancelled, they are existing shares, and the only

way of getting rid of them again is to sell them.  *  *  *
If that therefore was the intention of the resolution, then it
broke the rules, by enabling or forcing the company to enter
upon a business which is not mentioned in the memorandum
of association.   But if it was not intended to re-issue these
shares, then it seems to me to follow that the amount of cap-
ital represented by them was necessarily extinguished." And
in *Guinness* v. *Land Corporation of Ireland*, 22 Ch. D. 349,
LORD JUSTICE COTTON, after referring to sec. 38 of the com-
pany's act, said : "From that it follows that whatever has been
paid by a member cannot be returned to him.   In my opinion,
it also follows that what is described in the memorandum as
the capital cannot be diverted from the objects of the society.
It is, of course, liable to be spent or lost in carrying on the
business of the company, but no part of it can be returned to
a member so as to take away from the fund to which the
creditors have a right to look as that out of which they are
to be paid." In *Trevor* v. *Whitworth, supra,* a limited com-
pany was incorporated under the joint stock companies act
with the objects (as stated in its memorandum) of acquiring
and carrying on a manufacturing business.   The company
having gone into liquidation a former shareholder made a
claim against the company for the balance of the price of his
shares sold by him to the company before the liquidation and
not wholly paid for ; and it was held by the House of Lords
and Privy Council, reversing the decision of the Court of Ap-
peal, that such a company has no power under the companies
act to purchase its own shares, that the purchase was there-
fore *ultra vires,* and that the claim must fail.

In *Green's Brice's Ultra Vires*, 95, it is said : "There is a
great difference between dealing in the shares of other com-
panies and in its own.   The former is ordinary business
attended only with the usual risks of ordinary transactions, but
the latter tends inevitably to breaches of their duty on the
part of the directors, and to fraud and rigging the market on
the part of the corporation itself.   Consequently a corporation
to possess such a power, must have it conferred by the

plainest and most explicit language in its constating instruments." In several States, the power of a corporation to purchase its own shares has been denied, and it has been held that in the absence of express authority, a corporation, the amount of whose capital stock is fixed in its charter, has no power to purchase its own shares, either for the purpose of holding or selling them or for the purpose of cancelling and retiring them. In addition to the cases already cited we may refer to the following as found in 7 *Am. & Eng. Ency. L.* (2nd ed.) 819; *San Luis Obispo Bank* v. *Wickersham,* 99 Cal. 655; *German Savings Bank* v. *Wulfekubler,* 19 Kan. 65; *St. Louis Carriage Manf. Co.* v. *Hilbert,* 24 Mo. App. 338; *Currier* v. *Lebanon State Co.,* 56 N. H. 262; *Morgan* v. *Lewis,* 46 Ohio St. 1. The reasons given for the doctrine, apart from any express or implied statutory prohibition, are, that the purchase of its own stock by a corporation is not only a fraud upon the creditors who deal with the corporation on the faith that the capital is paid up, and a fraud upon and violation of the contract with stockholders who do not consent, but is also a violation of the charter. "The capital stock of a corporation," says Thompson, "being a trust fund for creditors, the general rule, in the absence of an enabling statute, is that a corporation cannot employ its funds in purchasing its own shares, thus distributing its capital among its shareholders to the manifest detriment of its creditors." 2 *Thomp.,* sec. 2054. And as to the protection of stockholders see 7 *Am. & Eng. Ency. L.,* 819, note, where it is said each stockholder has the right to insist that the capital stock shall remain and not be distributed to any other stockholder, and that to purchase shares and to pay for them out of the funds of the company would be a fraud upon the remaining stockholders.

From these cases (and others in addition might be cited) it seems perfectly manifest that a corporation by the purchase of its own shares, in the absence of legislative authority permitting that to be done, diminishes its capital to the extent of the shares so purchased, and this too although the purchase was intended to serve only a temporary purpose, save in the

instance where the stock is bought to secure the payment of an antecedent debt. *First Nat. Bk.* v. *Nat. Exchange Bk.*, 39 Md. 600. If such purchases effect a reduction of the stock, then, as that method of reducing the stock is not the method provided by the Code it must of necessity be an unlawful method, and, a contract entered into with a view of carrying out an unlawful method is a contract to do an unlawful thing, and consequently is an unlawful contract. Under such circumstances a plaintiff must look elsewhere than to a Court of justice for such assistance as he may require. It was aptly remarked *In re Dronfield Silkstone Coal Co.*, 17 Ch. D. 83. "It is inconsistent with the essential nature of a company that it should become a member of itself." And that is precisely what it does when it buys its own stock.

Aside from these direct adjudications it would seem to be clear as a necessary consequence from a corporation's want of power to release an unpaid subscription to its stock, that it was without authority to buy its own shares and thereby reduce the amount of its capital. "I can see," remarked the Master of the Rolls, "no distinction in principle, between returning to a shareholder a part of the paid-up capital in exchange for his shares, and wiping out his liability for the un-called-up sum payable thereon. Both methods involve a reduction of capital, which, as LORD WATSON pointed out in *Trevor* v. *Whitworth*, persons dealing with this company are entitled to rely upon as existing, either as paid up, or still to be called up, and such a reduction, therefore, can only hold good if sanctioned under the conditions prescribed." *Bellerby* v. *Rowland*, 2 Ch. (1902) 14. If a corporation be incompetent to release subscribers to its capital stock whose subscriptions have not been paid, it is equally without authority to expend the fund represented by the capital stock, to purchase shares held by a stockholder who has paid for them. *Hamor* v. *Taylor-Rice Eng. Co.*, 84 Fed. Rep. 396. Now it is definitely settled in Maryland that a corporation has no authority to release subscribers to its capital stock from paying the amount due by them therefor, *Rider* v. *Morrison*, 54 Md. 429;

and in the judgment there delivered the case of *Herman &
Ely, Extrs. of Burke,* v. *New Albany and Sandusky City Junc-
tion R. R. Co., Thos. L. Smith et al.,* 16 Wallace, 83 U. S.
390, was relied on, which has been affirmed by the Supreme
Court in *Sawyer* v. *Hoog,* 17 Wall. 620; *Scoville* v. *Thayer,*
105 U. S. 154; *Potts* v. *Wallace,* 146 U. S. 704. In *Rider* v.
*Morrison,* Rider's subscription to the stock of the Chesapeake
Mutual Land and Building Association to the extent of twelve
hundred and odd dollars was cancelled pursuant to a resolu-
tion passed by the directors, and dealing with that situation
this Court said: "In respect of the cancellation of the stock
by the secretary, it is clear that no such action by him could
in any manner release the appellant from liability, if any ex-
isted, for the unpaid installment due on his stock. And this
too, whether such entry was made by the secretary with or
without the direction of the board of directors. It was not
within the power of the secretary or the board of directors to
release the appellant from the payment of his subscription to
the stock of the company. The unpaid subscription to the
capital stock of a corporation constitutes a trust fund to be
held by the corporation for the benefit of creditors and share-
holders, and directors have no power to release a subscriber
to the prejudice of such creditor or to the injury of other
stockholders." Assuming, as the major premise, the propo-
sition announced by the Master of the Rolls in *Bellerby* v.
*Rowland, supra,* it necessarily and irresistibly follows that a
corporation has no authority to diminish its capital stock by
purchasing its shares when it has no power to release a sub-
scriber from the payment of his unpaid up shares; and inas-
much as in Maryland the latter power is explicity denied, the
former—the right to reduce the capital by the purchase of
shares—is forbidden. Upon two grounds, then, the purchase
by the Mechanics' Bank for the Maryland Trust Company of
the thirteen hundred and eleven shares of the latter's capital
stock was illegal. And those two grounds are first, that the
method of thus reducing the capital is at variance with the
only method which the Code permits; and secondly, that the

right to buy in paid-up shares does not obtain where the au-
thority to release a subscriber from paying the uncalled-up
installments does not exist, or where there is a statutory lia-
bility attached to the stock.

There is a line of cases not in accord with the English doc-
trine and the rule announced in the American decisions to
which we have alluded; and upon that line of cases the bank
relies to sustain the legality of the stock purchase transaction.
It will not be possible to review, within reasonable limits, all
of those cases.    They do not appear to us to rest upon either
a sound or a conservative basis.    Some of them are founded
on the assumption that a corporation has the right to cancel
a stock subscription, or to cancel notes given for shares upon
surrender of the certificates.    But that postulate is directly
and specifically antagonistic to the ruling of this Court in
*Rider* v. *Morrison;* and we agree with Mr. Morawetz that if
the decisions which maintain the right of a corporation to
purchase its own shares, are carried to their logical results, it
is apparent that a corporation may, at any time, by an easy
process, be made to shrink away and finally vanish into noth-
ing.    It would only be necessary to "purchase" shares from
its stockholders.    And in the end, after the last stockholder
had "sold" his own shares to the company and withdrawn
with the proceeds, nothing material would remain to attest the
former existence of the corporation except an empty treasury
and cancelled stock certificates.    *Mor. on Corp.*, sec. 113.    In
these days of "frenzied finance," and, in many instances of
reckless corporate management, it is not, or at least, ought
not to be, the policy of the law of Maryland to relax the
rigidity of the English rule which holds corporations, with
a firm grasp, strictly within the limits of their chartered pow-
ers, and does not falter in its condemnation of the traffic in
and the purchase of a corporation's own shares by the cor-
poration.    It is infinitely better that a corporation which aids
another corporation in the latter's efforts to traffic in its own
shares or to reduce the amount of its capital by the purchase
of its own stock, should suffer the loss of the money loaned

for the accomplishment of those purposes, than that, by allowing the lending corporation to recover the funds so advanced, a judicial precedent should be set for the encouragement of such unlawful ventures.    But none of the cases relied on by the bank, so far as we have been able to discover, go to the length contended for by the appellee here.    We have been referred to no case and amongst the numerous ones examined we have found none where the purchase by a corporation of its own stock was declared to be valid if the charter of that corporation or the organic law of the State or the statutes which controlled it imposed upon its shareholders an additional liability in favor of creditors beyond the amount invested in the stock; or where the enforcement of the contract of purchase would result in securing to the shareholders whose stock the corporation had purchased a higher price for their shares than could be realized by the remaining stockholders from the assets of the concern.    After paying creditors in full, the assets in the hands of a receiver belong to the shareholders, and if the corporation should, even when solvent and before going into liquidation, buy up some of its own shares at an exaggerated price for any purpose, it might so purchase them in order to get rid of troublesome holders thereof; and thus the capital of the concern might be diverted from its legitimate channel and be used for the benefit of recalcitrant or cantankerous members to the detriment of the confiding shareholders. This would be a fraud upon the latter and would be perhaps difficult to unmask; but it could never be perpetrated if the corporation is denied the right to purchase its own shares except to seeure the payment of an antecedent debt.

We come now to the inquiry concerning the bank's knowledge of, and participation in, what we have said was the illegal act of the trust company in the purchase of its own shares through the bank on the Stock Exchange.    As corporations from their nature can never act except through the instrumentality of agents, and can never be acted upon except through the instrumentality of their agents or their property, the general rule that notice of a fact acquired by an agent

while transacting the business of his principal is notice to the principal, applies with peculiar force to corporations. "In other words a corporation from its nature can in a strict sense have only constructive notice or knowledge of facts." "The most comprehensive rule with reference to this subject which can be stated is that notice communicated to, or knowledge acquired by, the officers or agents of corporations when acting in their official capacity or within the scope of their agency, becomes notice to or knowledge of the corporation for all judicial purposes," 13 *Cyc.*, 399, 400. There can be no doubt that Mr. Ramsay, the president of the National Mechanics Bank, knew fully and in detail the entire transaction, and that he acquired that knowledge, not whilst acting for himself nor adversely to the interests of the bank, but directly and specifically whilst acting for and in behalf of the bank. *Central Trust Co.* v. *Arctic Ice Co.*, 77 Md. 233. The knowledge thus acquired by Mr. Ramsay to the effect that the money to be advanced by the bank was to be used for the purchase of the Maryland Trust Company's shares was notice to the bank and charged that institution with knowing exactly what Mr. Ramsay knew in this respect. *Schwind* v. *Boyce*, 94 Md. 510. But even if there were room to debate this proposition, it is clearly and conclusively shown by the testimony of Mr. Ramsay himself that the directors of the bank were fully cognizant that the money of the bank was being advanced to enable the trust company to buy up its own shares in the open market; and they were bound to know the provisions of that company's charter with respect to the double liability imposed upon the company's shareholders. We quote from the testimony given by Mr. Ramsay as follows: "Q. You said, I paid for the stock; you meant that the bank paid for the stock, did you not? A. Yes, sir; the bank paid for the stock? Q. By whose authority did the bank pay for that stock? A. The transaction was known to our entire board of directors. Q. How was it known to the directors; who called their attention to it? A. I called their attention to it * * * Q. Did the board of directors authorize the

investment of $280,000 of the bank's money in this stock of the Maryland Trust Company?    A. They did not authorize the advance, but they approved them, as the transactions were made they were reported and approved."    Only one of the directors of the bank was called to the witness stand to break the force of this evidence, and he merely testified that *he* "never had any knowledge for what purpose the Maryland Trust Company was buying its stock," though he knew that the bank was lending the money to the trust company "for the purpose of enabling it to buy its stock."    It is needless to cite cases with a view of showing that under these circumstances the bank was fully apprised of the fact that the trust company was engaged in buying its own shares and thereby reducing its capital in a way and by a method contrary to the provisions of the Code, and therefore unlawfully; and that consequently the bank was consciously lending its funds to the extent of nearly one-third its capital for the purpose of enabling the trust company to violate the statute law of the State, or else to assist it in trafficking in its own shares. Having embarked with the trust company in such an illicit enterprise, it must not be surprised if a Court of equity· declines to impose or to fasten upon the trust company a liability to repay the money, especially as the shares purchased therewith have never been delivered to the trust company and have never even been scheduled in a list of its assets or investments.    It is, generally speaking, true that a lender of money is not concerned with the purpose for which the borrower secures it; but when he does know. and is apprised that it is being borrowed for an illegal use, the situation is altered and he becomes implicated, as a participant, in the unlawful transaction in furtherance of which the fund is used. "The doctrine that equity will not actively interpose for the relief of a party who has been a *particeps criminis* in an illegal or fraudulent transaction is not only one of general acceptance but it has on different occasions received the direct sanction of this Court."    *Baxter* v. *Deneen*, 98 Md. 203.    And in *Lester and Wife* v. *Howard Bank*, 33 Md. 562–563, this Court

said: "The rule of law is well settled that no action will lie to enforce a contract *malum in se*, nor if executed, to recover money paid under it.   *   *   *   In regard to contracts not *immoral*, or *criminal* in themselves, but prohibited by statutory law, the same general rule may be said to apply, not however universal in its application, but subject to certain exceptions as binding in authority as the rule itself. Public policy, it must be borne in mind, lies at the basis of the law in regard to illegal contracts, and the rule is adopted not for the benefit of parties, but of the public." And then this observation of LORD MANSFIELD in *Smith* v. *Bromley*, Doug. 697, was quoted with approval. "If the act is in itself immoral or a violation of the general laws of public policy, there the party paying shall not have this action."

A contract which is violative of some rule of public policy is illegal, and is aptly described as a contract of "evil tendency". *Bishop on Contracts, sec. 467.* The principle of the law which holds that no one can lawfully contract to do that which has tendency to be injurious to the public or against the public good is well settled and may be termed the policy of the law, or public policy in relation to the administration of the law. *15 Am. & Eng. Ency. L. 933.* It is the evil tendency of the contract and not its actual result which is the test of its illegality. *Ib. 934.* "Public policy means the public good. Anything that tends clearly to   *   *   *   *   undermine that sense of security for individual rights whether of personal liberty or of private property which any citizen ought to feel is against public policy." *Goodyear* v. *Brown*, 155 Pa. St. 514. Now the contract which furnishes the basis of the Bank's claim presents a two-fold evil tendency. The one, a misleading of the public, and particularly the oustanding shareholders of the Guardian Trust Company, to believe, contrary to the fact, that there was an actual and *bona fide* demand in the market for the Maryland Trust Company's shares, when the apparent demand was not only not real but was created in the execution of the contract expressly for the purpose of forcing the minority stockholders of the Guardian

Trust Company into the merger deal ; the other, a direct violation of the Statute respecting the reduction of the Maryland's capital stock.    In the first there was included in its accomplishment, a misapplication of the funds of the Maryland Trust Company to produce a fictitious value on the stock exchange ; and in the second there was involved a plain disregard of the provisions of the code.    Surely, a contract with such tendencies is in derogation of the public good and has a direct drift towards undermining that sense of security for individual rights of private property which every citizen ought to feel.    It has besides, an equally obvious tendency to encourage fiduciary officers of a company to use for improper purposes, the funds confided to their care for wholly different and legitimate projects.    Its proclivity is demoralizing and its direct influence is to relax that high regard for honest straightforwardness and rectitude which ought to mark every business undertaking.    It holds out temptations to resort to specious and colorable devices with a view to secure results which frankness and openness, by revealing the truth, would defeat ; and it lowers the moral tone of a community by substituting craftiness for candor as a factor in financial transactions.    In a word, to borrow a definition given by JUDGE MILLER, it is a contract "Which the common sense of the entire community would pronounce" to be against public policy.    *Trust Estate of Woods, &c.* 52 Md. 536.    "It is" as stated by Mr. Morawetz, "contrary to the fundamental agreement of the shareholders, and is condemned by the plainest dictates of sound policy."    Sec. 112.    Besides all this, it was a contract by and under which the amount of the capital stock of the Maryland Trust Company was reduced over one hundred and thirty thousand dollars by a mode totally different from that pointed out in the code ; though to lawfully reduce the capital, "it would be necessary to follow strictly the forms and methods prescribed by law."    *1 Mor. Cor. sec. 114.*    It was therefore a contract to do an unlawful thing and consequently unenforceable.    *B. & S. R. R. Co.* v. *Faunce,* 6 *Gill 80,* citing *Baugher* v. *Danner's Extrs. Decbr. Term 1844.*    Not-

withstanding all this the Bank participated, not in a passive, but in an active way in carrying out the contract, since the Bank itself with full knowledge on the part of its directors paid ont to the brokers, for the use of the vendors of the shares, the cost thereof as the certificates were delivered to it; and not one cent of the money expended by the Bank in pursuance of the contract ever went into the possession, or was subject to the control, of the Maryland Trust Company at all; and despite the fact that not a share of the stock so bought and thus paid for was ever delivered to the Trust Company, although about two years and a half elapsed between the dates of the purchases of the stock and the nineteenth of October, 1903, when the Trust Company went into the hands of a Receiver.    The Bank cannot under these conditions ask a Court of equity to decree that the money so expended by it be paid to it by the Receiver of the Trust Company.

But one more question remains to be considered, and it is this :    Assuming that the Executive Committee of the Trust Company in fact authorized the officers of that Company to make the contract with the Bank were the members of the Committee clothed with the power to confer such authority, or were they competent to enter into the contract themselves in behalf of the Trust Company.    By *Art. 2, sec. 7*, of the Maryland Trust Company's by-laws the Board of Directors was required to elect annually an executive committeee to consist of seven of the twenty-four members of the board. That committee was given by *Art. 3* of the by-laws "all the powers of the board of directors when the same is not in session    *    *    *    *    so far as the same can legally be done." These by-laws were adopted, not by the stockholders, but by the directors.    It is undoubtedly true that a board of directors has authority, acting as and for the corporation, to delegate to subordinate officers or agents or to a committee of their own number, the power to perform any act, in the course of the business of the corporation, which they themselves can legally perform, even though the performance of the act may involve the exercise of the highest judgment and discretion

provided there is express authority given therefor, or it is implied from usage or from the necessities in the management of the corporation. *3 Clark & Marshall, Pri. Corp. sec. 732. 1 Mor. on Corp. sec. 536.* It can hardly be contended with seriousness that the purchase by the Trust Company of its own stock, whereby it would be made to occupy the anomalous position of being a member of itself to the extent of the shares so bought, was an act done in the course of the business of the corporation. It was an extraordinary and unusual act obviously not within the contemplation of the by-law creating the executive committee. This view is strengthened by the fact that at the January Session of 1902 the General Assembly, by ch. 106, amended the Company's charter and distinctly empowered the board of directors to create an executive committee which would be authorized to exercise all the powers of the board of directors. If the by-law validly created an executive committee clothed with adequate power to act in the place of the directors, it was wholly unnecessary to procure, after all the thirteen hundred and eleven shares had been bought an Act of Assembly permitting a thing to be done, which if valid at all, had already been done. The amendment was not retroactive, and there is no evidence in the record to show that the directors of the Trust Company ever knew of the action of the executive committee under the by-law, until after the company had gone into the hands of the Receiver. Inasmuch as the purchase of the company's own stock was not an act done in the course of the business of the company it was not one which the executive committee, even if legally constituted, had power to authorize the officers to perform ; and consequently was not binding on the company or its shareholders. *Temple* v. *Dodge*, 89 Texas 68.

The conclusion which we have reached is that the contract under which the bank insists on payment, is invalid, first because it involved in its execution an unlawful reduction of the amount of the trust company's capital stock; secondly, because it destroyed the double liability attached to the shareholders whose stock was purchased; and thirdly, because it

was one which the executive committee had no power to make. It follows that the obligations held by the bank are not enforceable, and that the shares purchased by the bank belong to it and consequently the exceptions to the allowance of the claim of the bank should have been sustained and the claim should have been rejected. The order overruling the exceptions and directing the claim to be paid by the receiver of the Maryland Trust Company out of the assets in his hands will be reversed with costs above and below.

> *Order reversed with costs above and*
> *below and cause remanded.*

(Decided January 11th, 1906.)