Containing Cases of the January and April Terms, 1925.

## WILLIAM W. BRADFORD et al. vs. HARFORD BANK.

*Corporate Officer—Knowledge Imputed to Corporation—Bank Cashier—Kiting of Checks—Resulting Liabilities—Release of One Participant—Effect—Authority of Partner.*

While the acts of a corporate officer, acting within the scope of his authority and on behalf of and in the interest of the corporation, are binding on the corporation, the corporation is not bound if the officer's acts are not in furtherance of the business of the corporation, nor intended for its benefit and advantage.                                              p. 15

Where the cashier of a bank joined with others in a "kiting" transaction, which could not result in a benefit to the bank, but which did result, as he knew must result, in the paying out of large sums belonging to the bank without any security for their repayment, and he was acting solely for his own interest or the interest of his associates and confederates, and adversely to the bank's interest, the cashier's knowledge of the transaction could not be imputed to the bank, nor was the bank bound by his acts, so as to preclude it from recovering its losses from the cashier's associates in the transaction.          pp. 15-17

Where one, as part of a "kiting" transaction, drew checks on a bank for which there were no funds to his credit available, but which were paid, by the collusion of the cashier of the bank, out of the bank's funds, he became liable to the bank under Code, art. 13, sec. 79, providing that the maker of a negotiable instrument engages by making it that he will pay it according to its tenor.                              p. 18

When one draws on another an order for the payment of money to a third person, and the order is accepted by the person on whom it is drawn, by paying it, the law raises an

implied promise on the part of the maker or drawer to repay the latter party, which can be enforced under the common count for money paid by the plaintiff for the defendant at his request.                                    p. 19

Where, as the result of a "kiting" transaction, the participants therein became separately liable to a bank on account of their individual checks or drafts improperly paid out of the bank's funds, through the collusion of its cashier, the liability of each of them to the bank being contractual in its nature, the release by the bank of one or more of them from liability did not effect the release of the others, under the rule that the release of one joint tort feasor releases all.          pp. 17-22

Under Code, art. 73A, secs. 9, 13, 14, 15, one is bound by the act of his partner in drawing checks in the firm name in the usual way, although such checks were overdrawn by the latter as part of an illegal "kiting" scheme, without the knowledge of the former.                              pp. 22, 23

A firm is bound by notes or checks executed by one partner, without any showing that he had express authority from his copartner, if such authority can be implied from the nature of the business.                              p. 23

*Decided April 9th, 1925.*

Appeal from the Superior Court of Baltimore City (SOLTER, J.).

Action by the Harford Bank of Bel Air against William Bradford and Wakeman B. Munnikhuysen, partners trading as the Bel Air Packing Company. From a judgment for plaintiff, defendants appeal. Affirmed.

Plaintiff's prayers were as follows:

*First.*—If the jury shall find from the evidence that the defendants, William W. Bradford and Wakeman B. Munnikhuysen, co-partners, trading as Bel Air Packing Company, did on or about the 10th day of April, 1922, by their promissory note of that date (if the jury so find), now overdue, promise to pay to the order of the plaintiff $4,500.00

four months after April 10th, 1922, with interest, and did not pay the same or any part thereof, then the verdict must be for the plaintiff under the seventh count of the amended declaration, for $4,500.00 with interest thereon from April 10th, 1922.   (Granted.)

*Second.*—If the jury shall find from the evidence that the defendants, William W. Bradford and Wakeman M. Munnikhuyen, co-partners, trading as Bel Air Packing Company, by their four checks or orders respectively drawn upon the plaintiff bank: on November 7, 1921, for $4,800.00; November 3, 1921, for $5,900.00; November 7, 1921, for $3,-250.00; November 9, 1921, for $2,325.00; aggregating $16,-275.00 (if the jury so find), and that the plaintiff bank honored said checks or orders and paid the same, and that the defendants have not reimbursed or paid the plaintiff said sum of $16,275.00, or any part thereof, then the verdict must be in favor of the plaintiff under the eighth count of the amended declaration for the amount of said unpaid checks, with interest thereon in the discretion of the jury. (Granted in connection with the court's own instruction.)

*Third.*—If the jury find for the plaintiff under both the seventh and eighth counts of the amended declaration the verdict must be for the combined sum or sums the jury may so find under each of said counts.   (Granted in connection with the plaintiff's second prayer and the court's own instruction.)

*Fifth.*—In reference to the four checks sued on in the eighth count of the declaration, under the circumstances of this case as disclosed and proved by the undisputed evidence, Evans, cashier, and other employees of plaintiff bank were engaged with the defendant Bel Air Packing Company a certain Archer, Harvey & Company in kiting the said checks of Bel Air Packing Company which the plaintiff bank paid, against drafts on Archer, Harvey & Company that were never paid, and that in so doing the employees of plaintiff bank were acting without authority of the directors, stockholders, president or vice-president of plaintiff bank, and

wrongfully and adversely to the interests of said bank, hence knowledge acquired by said Evans, cashier, and other employees of said bank (participating in said wrong to said bank under the undisputed facts of the case) of the kiting of commercial paper, aforesaid, cannot be imputed to the bank. (Granted.)

The court's own instruction was as follows:

The jury are instructed that if they find from the evidence the total amount of the checks was $121,475 and shall further find that the plaintiff accepted the notes of Ewing for the sum of $4,800 as payment of overdrafts to that amount; and shall further find that the plaintiff accepted the note of the cashier, Evans, for $4,200, in payment of overdrafts to such amount; and shall further find that the plaintiff accepted the sum of one hundred thousand dollars in payment of overdrafts to such amount, then if they shall find for the plaintiff upon the eighth count of the declaration their verdict on said count shall be for the sum of $121,475 less such sums as they shall find from the evidence the plaintiff accepted as payments.

The prayers of defendant Wakeman B. Munnikhuysen were as follows:

*First.*—The jury are instructed that under the pleadings there is no legally sufficient evidence in the case entitling the plaintiff to recover as against the defendant Wakeman B. Munnikhuysen on account of the four checks mentioned in the evidence. (Refused.)

*Second.*—The jury are instructed that the uncontradicted evidence in the case shows that the defendants were copartners in the canning and packing business; that the four checks mentioned in the evidence were executed and issued by William W. Bradford for his own uses and purposes and in no way connected with the purposes of the said partnership; that the said Wakeman M. Munninkhuysen neither had knowledge of nor authorized nor ratified nor acquiesced in the acts of his co-partner in executing or issuing the said

checks, and that the plaintiff either knew or in the exercise of due diligence could have known that the said checks were executed and issued by William W. Bradford for uses and purposes in nowise connected with the said partnership or its business, and, therefore there can be no recovery as against the said Wakeman B. Munnikhuysen on account of said four checks. (Refused.)

*Third.*—The jury are instructed that if they find from the evidence that the defendants William W. Bradford and Wakeman B. Munnikhuysen were co-partners in the canning and packing business, and that the four checks mentioned in the testimony were made and issued by the defendant William W. Bradford for his own uses and purposes and for purposes not connected with the business of said partnership; and if they further find from the evidence that the defendant Wakeman B. Munnikhuysen had no knowledge of the acts of his co-partner in so executing the said checks and neither authorized nor ratified nor acquiesced in the said acts of his said co-partner, and that he had knowledge of said checks, and if they further find from all the circumstances that the plaintiff had notice that the said William W. Bradford was acting for himself in the transaction involving the said four checks or in the exercise of due diligence could have had such notice, if they so find, then there can be no recovery as against the defendant Wakeman B. Munnikhuysen on account of the said four checks. (Special exception sustained.)

The prayers of both defendants were as follows:

*First.*—The defendants pray the court to instruct the jury that there is no evidence in this case legally sufficient to entitle the plaintiff to recover. (Refused.)

*Second.*—The defendants pray the court to instruct the jury that there is no evidence legally sufficient to entitle the plaintiff to recover on the eighth count of the amended declaration filed in this case. (Refused.)

*Third.*—The defendants pray the court to instruct the jury that the burden of proof in this case is on the plaintiff.

and if the evidence adduced in this case leaves the minds of the jury in a state of equipoise that then their verdict must be for the defendant. (Granted.)

*Fourth.*—The defendants pray the court to instruct the jury that if they believe from the evidence that John A. Evans was a director and cashier of the plaintiff bank and a large stockholder therein and that said Evans allowed the defendants to give checks to order of Archer, Harvey & Co. on said bank from August, 1920, to November 9th, 1921, for large sums when he had no account at said bank and that said Evans when said checks arrived ·at said bank arranged to give other checks or drafts against them and if they believe that said checks never benefited said defendants and his name was only used as an accommodation then their verdict must be for defendants. (Refused.)

*Fifth.*—The defendants pray the court to instruct the jury that from the evidence in this case the plaintiff bank through its director and cashier was engaged in an illegal act in lending large sums of money to Archer, Harvey & Co., and that the law considers both guilty and one cannot therefore recover from the other and their verdict must be for the defendants. (Refused.)

*Sixth.*—The defendants pray the court to instruct the jury that notice to John A. Evans was notice to the bank and if they believe that the said Evans agreed with Bradford to give these checks then their verdict must be for defendants. (Refused.)

*Seventh.*—If the jury believe from the evidence that the four checks sued on in this case are paid then their verdict on eighth count must be for the defendants. (Special exception sustained.)

*Eighth.*—The jury are instructed that if they shall find from the evidence that a conspiracy existed between the defendants or either of them and Archer, Harvey & Company in order to employ the credit of the plaintiff bank; and if they further find from the evidence that the said Archer, Harvey & Company in consideration of the payment of one

hundred thousand dollars was exonerated and released from
any claims or demands on account of said conspiracy, then
there can be no recovery as against the defendants in this
case on account of the four checks which have been men-
tioned in the evidence.　(Refused.)

The cause was argued before BOND, C. J., URNER, ADKINS,
DIGGES, PARKE, and WALSH, JJ.

*John L. G. Lee,* with whom was *Cornelius V. Roe* on the
brief, for the appellant.

*Samuel K. Dennis,* with whom was *Thomas H. Robinson*
on the brief, for the appellee.

DIGGES, J., delivered the opinion of the Court.

The appeal in this case is from a judgment obtained in
the Superior Court of Baltimore City by the appellee, the
Harford Bank of Bel Air, against the appellants, William
W. Bradford and Wakeman B. Munnikhuysen, partners
trading as the Bel Air Packing Company, for the sum of
$17,560.　The declaration contained the common counts and
two special counts, the first of the special counts declaring
on a promissory note, dated April 10th, 1922, of the de-
fendants for the sum of $4,500, and the second of said counts
declaring on four checks drawn by the defendants on the
appellee, aggregating $16,275, being dated in the month of
November, 1921.　The case was originally instituted in the
Circuit Court for Harford County and subsequently re-
moved to the Superior Court of Baltimore City, where it
was tried with the aid of a jury, and resulted in a verdict
in favor of the plaintiff, upon which verdict, after defend-
ants' motion for new trial was overruled, judgment was
entered for the sum as stated.　During the trial twenty-one
exceptions were reserved by the appellant, twenty to the ad-
mission or rejection of evidence, and one to the court's ruling
on the prayers.　The plaintiff offered four prayers desig-
nated plaintiff's first, second, third and fifth prayers, the

first and fifth of which were granted in connection with the court's instruction. The defendant Munnikhuysen individually offered three prayers, and the defendants generally offered eight prayers, all of which were rejected except the defendants' third prayer, instructing as to the burden of proof, which was granted.

This case grows out of the banking and brokerage operations of Archer, Harvey & Company of Baltimore City. The claim of the appellee on the promissory note described in the seventh count of the declaration, for $4,500 with interest, was undisputed, and it is unnecessary to further allude to this note. The real contest between the parties is in respect to the claim of the appellee based upon the four checks drawn on the Harford Bank by the Bel Air Packing Company, as set out in the eighth count of the declaration, for the aggregate sum of $16,275. The essential facts, as disclosed by the record, which are necessary to be set out herein for a comprehensive understanding of the case, are as follows:

The Harford Bank of Bel Air is a state bank located at Bel Air, Harford County, Maryland. Its president is, and was at the time of the transaction herein referred to, Mr. Stevenson A .Williams; its vice-president, Judge William H. Harlan, and its cashier, Mr. John A. Evans. Mr. Williams, Judge Harlan, and Mr. Evans, together with several other gentlemen, constituted the board of directors. Loans made by the bank were made only on the authority of the executive committee of the board of directors, which met frequently, and these loans, authorized and made by the executive committee, were ratified at the next succeeding meeting of the board of dirctors, which meetings were held weekly. Mr. Evans, the cashier, had no authority to make loans or to permit overdrafts. The president and vice-president kept in close daily touch with the general affairs of the bank. On November 22nd, 1921, one of the assistant State bank examiners reported to Mr. Williams, the president of the appellee, that he had learned from information obtained

from banks and trust companies in Baltimore, and from
his examination of the appellee's books, that a "kite," in-
volving loss to the appellee, had been going on. Upon Mr.
Williams receiving this information, he in connection with
the State bank examiner's department, made further investi-
gations, which resulted in the discovery that the practice of
"kiting," endangering the financial stability of the bank, had
been in progress for some time, and that certain employees
of the bank had knowledge of this condition.   These em-
ployees were Mr. Evans, the cashier, Mr. Anderson, a clerk,
Mr. Bruns and Miss Gorrell.   None of the other employees
of the bank had knowledge or suspicion of these irregular
or illegal practices.   These improper and irregular transac-
tions, resulting in heavy loss to the bank, had been in prog-
ress for twelve or eighteen months before being discovered,
and were participated in by the firm of Archer, Harvey &
Co., Mr. Evans, Mr. Bradford of the Bel Air Packing Com-
pany, and Harvey Ewing, and involved ultimately an indeb-
edness to the bank by Evans, Ewing, the Bel Air Packing
Co. and Archer, Harvey & Co., amounting to $121,475.
The method followed was for Bradford, a member of the
firm of the Bel Air Packing Company, to draw the firm's
check upon the Harford Bank payable to Archer, Harvey &
Co., these checks being signed as "Bel Air Packing Co." by
Bradford.   This company had a legitimate account at the
Harford Bank, which it had maintained for many years,
either of the partners, Bradford or Munnikhuysen, being
authorized to sign checks for the firm.   Bradford, however,
being the office man, signed the great majority of legitimate
firm checks and signed all the Bel Air Packing Company's
checks involved in this transaction.   Upon receiving the Bel
Air Packing Company's check, payable to the order of
Archer, Harvey & Co., C. Graham Archer, one of the firm,
would endorse and deposit the check in the firm's account at
his firm's Baltimore bank.   In regular course the Bel Air
Packing Company's check would reach the Baltimore branch
of the Federal Reserve Bank.   The Federal Reserve Bank,

in its daily "letter" to the Harford Bank listed each day all of the checks coming through drawn on the Harford Bank, this listing being in figures only, without other description, and including therein the Bel Air Packing Company's checks involved in the kite. When these "letters" were received by the Harford Bank, it, through its cashier or one of its employees who had knowledge of the kite, under the direction of Evans, the cashier, would issue its check on the Merchants' Bank in Baltimore, its reserve agent, to the Federal Reserve Bank for an amount equal to the total of the items shown in the Federal Reserve Bank's statement or "letter," which letter also contained the checks listed in the letter, drawn by its depositors on the Harford Bank. Neither the Bel Air Packing Company nor Archer, Harvey & Co. put up any money. The amount of the check, drawn by the Harford Bank to the Federal Reserve Bank in payment of these daily statements or letters, was entered on the general ledger of the Harford Bank. The checks drawn by depositors of the Harford Bank and enclosed in the Federal Reserve letter or statement, and paid as described therein, were charged against the appropriate individual accounts of such depositors, which was the regular and legal method of transacting the bank's business.

As to the kite checks, this method could not be pursued, because the maker of the kite checks had no funds, or insufficient funds, on deposit to pay the checks. The kite checks, drawn by Bradford in the name of the Bel Air Packing Company, were separated from the other checks enclosed in the Federal Reserve Bank letters and not charged to the Bel Air Packing Company's account—which, if same had been done, would have shown overdrafts—but were laid aside by one of the clerks of the bank who had knowledge of the kiting scheme, and were not protested or returned upon balancing the pass book of the Bel Air Packing Company. Instead, Bradford was informed that the kite checks were at the Harford Bank and was given a draft to sign in the name of the Bel Air Packing Company, drawn on Archer,

Harvey & Co., for the exact amount of the kite, to be then handled, and made payable to the Harford Bank. The Bel Air Packing Company's draft was then entered on the general ledger, thereby bringing in balance that ledger and charged against the Harford Bank's Baltimore correspondent and mailed thereto for collection. When these drafts were presented to Archer, Harvey & Co. they were generally paid by new kite checks borrowed by Archer, Harvey & Co. from some one of the persons connected with the kite transaction, thus again starting the circle, and resulting, by the completion of each transaction, in largely increasing the amount illegally paid out by Evans or under his direction from the funds of the Harford Bank.

The investigation disclosed that the Bel Air Packing Company had made and used, in the operations of the kite, checks on the Harford Bank amounting to approximately $175,000. It was impossible for this system to continue indefinitely without detection, and when the collapse came it was found that Evans had kite checks outstanding to the amount of $4,200, Ewing, $4,800, and the Bel Air Packing Company, $16,275, the amount of the four checks sued on in this case. The total outstanding obligations of those engaged in the kiting transaction—Evans, Ewing, Bel Air Packing Company, and Archer, Harvey & Co.—amounted to $121,475, this amount being due the bank and having been paid out of the bank's funds in payment of checks or drafts of one or the other of the parties implicated. The four checks here sued on came in possession of the president of the Harford Bank for the reason that the drafts given by the Bel Air Packing Company, drawn on Archer, Harvey & Co. to offset or balance these checks, were returned unpaid. When this condition became known the liability of the four parties engaged in the kiting transaction, represented by unpaid checks or drafts, was: Evans, $4,200, Ewing, $4,800, Bel Air Packing Company, $16,275, and Archer, Harvey & Co., an indefinite sum, at that time known to be at least $88,000. At this time Messrs. Robert Archer and William S. Archer, brothers

of C. Graham Archer, a member of the firm of Archer, Harvey & Co., in an endeavor to extricate their brother from the effect of his illegal transactions by which, in connection with the others, the bank had been defrauded, executed an agreement dated November 29th, 1921, guaranteeing the bank against loss up to $100,000, and in consideration of which guarantee the bank, in the same agreement, released Archer, Harvey & Co. from the repayment of any loss in excess of $100,000. This agreement being as follows:

"This agreement made this 29th day of November, in the year 1921, by and between William S. Archer and Robert Archer, both of Harford County, in the State of Maryland, of the first part, and the Harford Bank of Bel Air, a corporation of said State, of the second part,

"Whereas the Bank Commissioner of Maryland has directed the attention of said bank to the fact that certain drafts and checks have passed between Messrs. John A. Evans, William W. Bradford, Harvey Ewing and the Bel Air Packing Company, individually, and the firm of Archer, Harvey and Company, of Baltimore City, in said State, whereby the said Archer, Harvey & Company has received large sums of money claimed as belonging to said bank, and has demanded that said bank require the repayment of said sums of money; and

"Whereas the said bank has demanded such payment from Archer, Harvey & Company, and the exact amount of the money so passing to said Archer, Harvey & Company under said drafts and checks is not yet exactly determined; and

"Whereas the parties hereto of the first part are willing to guarantee the repayment and refunding of said money so passing as aforesaid up to the sum of one hundred thousand dollars ($100,000), the said exact amount to be hereafter determined by the said Bank Commissioner, the same to be paid as follows:

"Twenty thousand dollars ($20,000) on or before the 20th day of December, 1921; twenty thousand dollars ($20,000), with interest from this date, on

or before the 20th day of February, in the year 1922; twenty thousand dollars ($20,000), with interest, on or before April 20th, 1922; twenty thousand dollars ($20,000), with interest, on or before the 20th day of June, in the year 1922, and the balance with interest on or before the 20th day of August, 1922.

"It is understood and agreed that the said sums so passing as aforesaid from the said bank to the said Archer, Harvey and Company have reached at least the sum of eighty-eight thousand dollars ($88,-000), and may exceed the said sum of one hundred thousand dollars ($100,000).

"Now, therefore, the said parties of the first part, in consideration of the execution of this agreement by the said bank and the aforesaid extension of payment herein contained, hereby guarantee to the extent aforesaid the payment of said money as aforesaid so passing from said bank to said Archer, Harvey and Company.

"And the said bank in consideration aforesaid hereby releases the said Archer, Harvey and Company, both as a firm and individually, from all claims and demands whatsoever which it has or may have against them, over and above the amount hereinbefore mentioned.

"Witness the hands and seals of the said parties of the first part, and the seal of the said bank and the hand of the President thereof.

William S. Archer.   (Seal)

Robert Archer.   (Seal)

The Harford Bank of Bel Air,

By S. A. Williams,

President.

Test in duplicate:

Lewis J. Williams.

| Dec. | 20/21 | Part payment | $20,000. |
| Feb. | 20/21 | Part payment | $20,266. |
| Apl. | 21/22 | Part payment | $20,466. |
| June | 20/22 | Part payment | $20,666. |
| Aug. | 22/22 | Part payment | $20,866." |

The record further discloses that Robert Archer and William S. Archer paid the bank, in accordance with said agreement, $100,000 and interest; that Evans gave his note, which the bank accepted, for $4,200, representing his check involved in the kite and unpaid; that Ewing paid $4,500 in compromise of his liability of $4,800 on his kite check; that by these settlements the total loss of $121,475 was reduced to $12,775, which remained, with all claims liquidated against all engaged in the kite except the Bel Air Packing Company. Demand having been made by the bank for settlement of the checks and note declared on in the seventh and eighth counts of the declaration, and refused, the suit in this case was instituted and resulted in the obtention of the verdict and judgment appealed from. The appellants practically admit the facts as claimed by the appellee, but dispute the legal conclusions deducible from these facts, as set out in the rulings of the lower court on questions of law embodied in the prayers of the plaintiff and the court's own instruction.

The two principal legal contentions of the appellant are: First, that the bank had knowledge of the illegal transaction represented by the kiting scheme, for the reason that Evans, the cashier and one of the directors of the bank, was participant in this illegal transaction, and that all the knowledge that he possessed in respect thereto was knowledge on the part of the bank; that the bank was responsible for Evans' acts, and therefore, if loss occurred to the bank through illegal transactions of which Evans had knowledge and in which he participated, it cannot recover any loss sustained through such transactions; and, second, that the agreement made by Robert Archer and William S. Archer, by which, upon the payment or guarantee of $100,000 to the bank, Archer, Harvey & Co. was fully released, constituted and had the legal effect of a release to all of the parties in the kiting transaction which resulted in loss to the bank.

The first of these contentions is opposed to the great weight of authority and is contrary to numerous decisions of

this Court.  While it is undoubtedly true that the acts of an officer of a corporation acting within the scope of his authority and on behalf and in the interest of the corporation, will bind the corporation, nevertheless, it is equally well settled by reason and authority that if the acts of the officer are not in furtherance of the business of the corporation and intended to be for its benefit and advantage, they cannot bind the corporation.  *United States Ins. Co. v. Shriver,* 3 Md. Ch. 381; *Winchester v. Baltimore & Susquehanna R. R. Co.,* 4 Md. 231; *Merchants Bank v. Marine Bank,* 3 Gill, 97; *General Ins. Co. v. U. S. Ins. Co.,* 10 Md. 517; *Gray v. Farmers Bank,* 81 Md. 631; *Schuck v. Bramble,* 122 Md. 411; *First Denton National Bank v. Kenney,* 116 Md. 24. The appellant cites as authority for his opposite contention, *Maryland Trust Co. v. Merchants Bank,* 102 Md. 608.  A careful examination of this opinion does not bear out the contention of the appellant.  At page 630 Judge McSherry, speaking for the Court, said:  "The most comprehensive rule with reference to this subject which can be stated is that notice communicated to, or knowledge acquired by, the officers or agents of corporations when acting in their official capacity or within the scope of their agency, becomes notice to or knowledge of the corporation for all judicial purposes. 13 *Cyc.* 399-400.  There can be no doubt that Mr. Ramsay, the president of the National Mechanics Bank, knew fully and in detail the entire transaction, and that he acquired that knowledge not whilst acting for himself nor adversely to the interest of the bank, but directly and specifically whilst acting for and in behalf of the bank.  *Central Trust Co. v. Arctic Ice Machine Co.,* 77 Md. 233.  The knowledge thus acquired by Mr. Ramsay to the effect that the money to be advanced by the bank was to be used for the purchase of the Maryland Trust Company's shares was notice to the bank and charged that institution with knowing exactly what Mr. Ramsay knew in this respect.  *Schwind v. Boyce,* 94 Md. 510.  But even if there were room to debate this proposition, it is clearly and conclusively shown by the testimony of Mr.

Ramsay himself that the directors of the bank were fully cognizant that the money of the bank was being advanced to enable the trust company to buy up its own shares in the open market; and they were bound to know the provisions of that company's charter with respect to the double liability imposed upon the company's share holders." In that case Mr. Ramsay was president of the bank and there was no question that not only he but all of the board of directors were fully informed as to the transaction of Mr. Ramsay in behalf of the bank; while in the present case, whatever knowledge Evans had of the illegal transaction in which he was engaging, was carefully concealed from any of the higher officers of the bank or any of the other members of the board of directors. In addition, the vital and controlling difference between that case and the case under consideration is that in the one Mr. Ramsay's knowledge was acquired, *not whilst acting for himself nor adversely to the interest of the bank,* but directly and specifically whilst acting for and in behalf of the bank, whereas in the present case Evans was engaged in a transaction which could not result in a benefit to the bank, but which did result, and he knew must result, in the paying out of a very large sum of money belonging to the bank without any security for its repayment. He was acting solely for his own interest, or the interest of his associates and confederates, and adversely to the interest of the bank. The former decisions of this Court, above cited, fully substantiate this statement as being the law in such cases. It would be difficult to conceive how a court could hold otherwise, for to do so would be to permit any unscrupulous or dishonest official of a corporation to engage with associates in transactions deliberately designed to defraud the corporation, or at least resulting in loss thereto; and when his associates in the fraudulent transaction were undertaken to be brought to account, to allow them to set up as a defense the fact that their confederate, an officer of the bank, knew of the illegal transaction and that his acts were the acts of the corporation, would produce a situation such as justice and law

would not permit. The rule that knowledge obtained by an officer of a corporation is knowledge which the law imputes to the corporation, and that the acts of an officer or employee of a corporation bind the corporation when acting within the scope of his authority, has repeatedly been approved by this Court; but this rule is necessarily limited by the requirement that the knowledge and act of the officer must be used and done on behalf of the corporation and not adversely to its interest.

By the plaintiff's fifth prayer, which was granted, the court instructed the jury: "In reference to the four checks sued on in the eighth count of the declaration, under the circumstances of this case as disclosed and proved by the undisputed evidence, Evans, cashier, and other employees of plaintiff bank were engaged with the defendant Bel Air Packing Company, a certain Archer, Harvey & Company in kiting the said checks of Bel Air Packing Company which the plaintiff bank paid, against drafts on Archer, Harvey & Company, that were never paid, and that in so doing the employees of plaintiff bank were acting without authority of the directors, stockholders, president or vice-president of plaintiff bank, and wrongfully and adversely to the interest of said bank, hence knowledge acquired by said Evans, cashier, and other employees of said bank (participating in said wrong to said bank under the undisputed facts of the case) of the kiting of commercial paper, aforesaid, cannot be imputed to the bank." In the view we have expressed, we find no error in the granting of this prayer, but hold that it properly presented the law governing the facts of this case.

The second contention of the appellant is unsound, for the reason that the theory upon which it is presented is that Archer, Harvey & Co. and the Bel Air Packing Company were joint tort-feasors, and that the payment by one of the joint tort-feasors in settlement of the injury complained of, accepted as such, and for which it was given a release, releases the other joint tort-feasors. It is unnecessary to cite authorities to support the proposition that if the case was an

action of tort to recover damages for an injury committed by several jointly, the release of one would be a discharge of the others. This rule is stated in *Am. & Eng. Encyc. of Law,* vol. 24, page 306, as follows: "A release or discharge of one or more joint tort-feasors, executed in satisfaction of the tort, is a discharge of them all, on the ground that the party injured can have but one satisfaction for the injury. Each is considered as sanctioning all the acts of the other, thereby making them his own, and each is liable for the whole damage as if it had been occasioned by himself alone; hence the law considers that he who pays for the injury has paid for it all, and there is nothing left for which the other tort-feasors can be held liable." To the same effect see *Gunther v. Lee,* 45 Md. 60, at page 67; *Berkely v. Wilson,* 87 Md. 219.

The present case is not an action of tort, but an action of contract growing out of the appellants' drawing the four checks sued on against the appellee, and those checks having been paid by the appellee when there were no funds or insufficient funds in its hands to pay the same. Or, stating the proposition in a different way: the appellant by the checks in question ordered the Harford Bank to pay to Archer, Harvey & Co. the sums stated in the respective checks. These orders of the appellant were accepted by the bank, as evidenced by their payment out of its own funds. Upon this payment being made, at times when the appellant had not sufficient funds on deposit to meet the checks, it created the contractual obligation on the part of the appellant to make good and repay to the appellee the amount so paid by it. The claim is not for damages for injury suffered by the bank, occasioned by the Bel Air Packing Company individually or in connection with the other parties who participated in the kiting transaction, but is a suit for reimbursement for money paid by the bank on behalf of the Bel Air Packing Company to Archer, Harvey & Co., upon its order, represented by the checks. Section 79, article 13, Code of Pub. Gen. Laws, provides: "The maker of a nego-

tiable instrument, by making it, engages that he will pay it according to its tenor; and admits the existence of the payee and his then capacity to endorse." The checks of the appellants were negotiable instruments of which they were the makers, and under the statute, by the act of making, they engaged to pay them according to the tenor thereof. But even if we disregard the provisions of the statute, when one draws an order for the payment of money on another, payable to a third person, and this order is accepted by the party on whom it is drawn, by paying the same, the law raises an implied promise on the part of the maker or drawer of the order to repay the party upon whom it is drawn, and accepted by payment, which can be enforced under the common count: "For money paid by the plaintiff for the defendant at his request."

The payment by the brothers of Graham Archer of $100,-000 in accordance with the agreement between them and the appellee, by which agreement the appellee released all claims against Archer, Harvey & Co., could not operate as a release to the appellants on the theory that they were joint tortfeasors, because the suit was not for damages for an injury committed, but was a suit to enforce a contractual obligation of the appellants growing out of a series of transactions by which several other parties became contractually liable to the appellee, and for which contractual liability the appellee had a right of action against each individually. When discovery was made of the transactions which resulted in monetary loss to the Harford Bank, the four parties engaged in the kiting transaction were found to be separately indebted to the bank in different amounts: Ewing to the extent of $4,800, represented by his check; Evans to the extent of $4,200, represented by his check; Bel Air Packing Company, to the extent of $16,275, represented by their four checks; and Archer, Harvey & Co. to an indefinite amount, represented by drafts drawn to the order of the bank and accepted by that firm; on all of which checks and drafts the bank had paid out its money and had not been reimbursed

therefor.   In this condition of affairs the appellee sought
reimbursement from the various parties to the extent of the
amount due by them, and succeeded in obtaining settlement
from all of them with the exception of the appellants, the
reimbursement for the amount due by Archer, Harvey & Co.
being made by Robert Archer and William S. Archer by
paying or agreeing to pay $100,000 in consideration of the
full release by the appellee of all claims which it might have
against Archer, Harvey & Co.   This payment by the brothers
of C. Graham Archer only operated to discharge the debt
or contractual obligation of Archer, Harvey & Co. to the
bank and did not inure to the benefit of the appellants, unless
the terms of the release, as set out in the agreement, can be
construed to operate as a release of all the parties connected
with the kite transaction.   The language employed in the
release is not susceptible of such a construction as would
release the appellants, and it is apparent from the whole
of the agreement that it was not so intended.

The payment of $100,000 was made by the brothers of C.
Graham Archer for the purpose, and only for the purpose,
of settling the obligations of the firm of which he was a
member, and did not constitute a release of the indebtedness
or contractual obligations of any of the other parties engaged
in the kiting transaction, even though their respective indi-
vidual obligations grew out of a fraudulent transaction of
which they all had notice and in which they all participated.
*McShane v. Howard Bank,* 73 Md. 136.   The facts in that
case were similar to the present case.   The cashier and presi-
dent of the Howard Bank entered into a combination to de-
fraud the bank, whereby, when discovered, the cashier had
embezzled approximately $8,000 and the president $38,000.
When the defalcation was discovered, upon a reorganization
of the bank, settlement was made with Edmonds, the presi-
dent, by the bank receiving from him a small percentage of
the amount he owed, and executing to him a release under
seal of the corporation.   The cashier, Ridgaway, having been
discharged and being financially unable to pay the amount

of his defalcation, his bond was put in suit. One of the
grounds of the defense, as in this case, was that the release of
Edmonds, the president, under seal, operated as a release of
Ridgaway, the cashier, and therefore his bond was not liable.
This Court, speaking through Judge McSherry, said: "Ed-
monds had taken some $38,000 of the bank's money wrong-
fully. Ridgaway had also taken $8,133. Each had violated
his plain duty, and possibly each had helped the other to do
so. But Edmonds is not a party to Ridgaway's bond either
as joint obligor or surety. The release of Edmonds for a
small part of his heavy defalcation from all the balance that
he owed to the bank, could in no way operate to discharge the
sureties of Ridgaway from liability for what their principal
owed to the bank. The sureties of Ridgaway were not an-
swerable for Edmond's dishonesty, and any adjustment made
by the bank with Edmonds, with a view of securing some-
thing from him, neither increased nor diminished nor in
any way affected their liability for the wrongful acts of
Ridgaway. The causes of action against Edmonds and Ridg-
away were distinct and separate, and though both were
wrongdoers, they were not such joint tort-feasors as that the
release of one from the result of his wrongful acts discharged
the other also from the consequences of his. In ordinary
cases of joint tort-feasors, if one is released from responsi-
bility for an act jointly committed by both and for which
each is liable to the full extent of the injury done, both are
discharged. (*Gunther v. Lee,* 45 Md. 60.) But the pri-
mary civil liability of Edmonds and Ridgaway was separate,
and extended to the amounts respectively due by each,
though each incidentally might have been involved crimi-
nally in the penal act of the other. The obligation upon each
was to restore that which he had taken. The extent of that
obligation was measured by the amount which each had
abstracted. The return by one of them of any part of what
he owed and his release as to the balance could not possibly
discharge the others from his duty to restore what was due
by him."

If, as held in that case, a release of Edmonds did not operate as an extinguishment of the liability of Ridgaway, neither can a release given to Archer, Harvey & Co. by the appellee here operate to extinguish the debt due by the appellants. In the present case Archer, Harvey & Co. and the Bel Air Packing Company were not joint obligors; they were not jointly liable for the amount each had succeeded in having the appellee pay in settlement of their respective checks and drafts, but were individually liable in a civil action to the extent to which each was individually indebted, and no more. Therefore if the appellee saw fit to accept from the brothers of C. Graham Archer the sum of $100,000 in settlement of his firm's civil liability, it was at perfect liberty to do so without affecting its right to proceed in the enforcement of its liability against the appellants, and this without regard to whether the amount paid on behalf of Archer, Harvey & Co. was more or less than that firm's real indebtedness.

The three prayers offered specially on behalf of the defendant Wakeman B. Munnikhuysen, which were rejected by the lower court, sought to have the jury instructed that if they found the defendant Munnikhuysen neither had knowledge of nor authorized or ratified the acts of his co-partner in executing or issuing the checks signed "Bel Air Packing Co., by William W. Bradford," sued on in this case, the plaintiff was not entitled to recover against Munnikhuysen. These prayers were properly rejected, for the reason that the act of Bradford, one of the partners, in signing the checks, bound the partnership. Bradford had full authority to draw these checks, which were drawn in the usual way in which all checks of the Bel Air Packing Company were drawn. The statute fully fixes the liability of a partnership in such cases. Article 73A, sections 9, 13, 14, 15, Code of Pub. Gen. Laws, provides as follows:

"Sec. 9. Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the

business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority."

"Sec. 13.   Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act."

"Sec. 14.   The partnership is bound to make good the loss:

"(a) Where one partner acting within the scope of his apparent authority receives money or property of a third person and misapplies it; and

"(b) Where the partnership in the course of its business receives money or property of a third person and the money or property so received is misapplied by any partner while it is in the custody of the partnership."

"Sec. 15.   All partners are liable:

"(a) Jointly and severally for everything chargeable to the partnership under sections 13 and 14;

"(b) Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract."

See also *Maltby v. N. V. R. R. Co.,* 16 Md. 422; *Coursey v. Baker,* 7 H. & J. 28; *Folk & Smith v. Wilson,* 21 Md. 538; *Doremus v. McCormick,* 7 Gill, 49.   Under the authority of the last cited cases, Munnikhuysen is jointly liable with Bradford, provided Bradford acted within the scope of his authority as a partner.   It has been repeatedly decided by our predecessors that a firm is bound by notes executed by one partner, without showing that he had express authority from his co-partner, when such authority would be implied from the nature of the business.   *Porter v. White,* 39 Md. 613; *Hopkins v. Boyd,* 11 Md. 109; *Coursey v.*

*Baker, supra.* We find no error in the ruling of the lower court on the prayers or in the court's instruction. None of the exceptions in respect to the testimony were strongly urged in the argument or brief of the appellants. We have examined these exceptions, and by reason of the view taken of the law in the cases we find no reversible error in them.

*Judgment affirmed, with costs.*