KAY, ᴇᴛ ᴀʟ. *v.* GITOMER

[No. 169, September Term, 1968.]

*Decided April 2, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, SINGLEY and SMITH, JJ.

*Jerry H. Hyatt,* with whom were *Linowes & Blocher, R. Robert Linowes* and *John J. Delaney* on the brief, for appellants.

*Harry K. Wolpoff,* with whom was *Robert A. Wallace* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Montgomery County sitting in equity, directing that the appellants, Albert J. Kay and Benjamin F. Eckles, convey to the appellee, Norman M. Gitomer, title to lot 5 in block H of R. Holt Easley's subdivision of Silver Spring. The lower court granted specific performance upon a finding that title to the lot was held by Kay and Eckles as tenants in partnership and that a contract for the sale of the lot signed only by Kay was binding on the partnership. We cannot say that the court's findings of fact were clearly erroneous or that it misapplied the law. Maryland Rule 886 a; *Diggs v. Siomporas,* 248 Md. 677, 237 A. 2d 725 (1968).

Kay and Eckles are brothers-in-law. In the spring of 1959, Kay was engaged in the plumbing and contracting business in Silver Spring and was doing some speculative building for his own account. Mr. and Mrs. Eckles were employees of a plumb-

ing contractor in the District of Columbia. At a date not specified in the testimony, Kay and Eckles determined to go into the plumbing and contracting business as partners, but no formal agreement of partnership was ever entered into. This decision was the first in a chain of events which led to the present controversy.

The Kays and the Eckles pooled their resources and purchased lot 5, which contained 10,000 square feet, and was unimproved except for a small garage or shed, together with the rear 50 feet of adjoining lots 1 to 4 on which was located a frame bungalow. Title was taken on 18 June 1959 by Mr. Kay and Mr. Eckles as tenants in common, but Mrs. Kay and Mrs. Eckles joined their husbands in a purchase money deed of trust, which mortgaged the 50 foot portion of the four adjacent lots (but not lot 5) to secure a loan of $11,500.

During the summer of 1959, Kay was finishing three or four houses that he had started earlier in the year. Eckles gave up his job in Washington at the end of August, and in September, the partnership of Kay and Eckles, Building Contractors, established its office in the bungalow on lots 1 to 4. It is not clear whether lot 5 was ever used by the partnership, but in 1960, it was rented as a parking lot.

The partnership was not immediately successful. In 1959, it filed no income tax return. In 1960, its first full year of operation, it sustained an operating loss of $6,830.97. Sometime in November, 1964, Eckles and Kay told Augie Urciolo, a real estate agent in Silver Spring that they might sell lot 5 if they could get the right price. Urciolo interested Gitomer in the property, and on 23 November came to them with Gitomer's offer of $40,000, of which $10,000 was to be paid in cash, which they rejected. According to Urciolo, Eckles and Kay indicated that they would accept $45,000, if 29% of the purchase price were paid in cash. On 24 November, Urciolo returned with a new contract, providing for a purchase price of $45,000, of which $13,000 was to be paid in cash at time of settlement, with the balance of $32,000 to be secured by mortgage. The contract was subject to the lot's being rezoned C-2 (general commercial).

Eckles had left for Myrtle Beach after the conversation on 23 November, and was gone for the rest of the week. Urciolo

came to see Kay on 25 November, and Kay signed the contract. Urciolo then suggested that two signatures would be needed; Kay signed Eckles' name, and the contract was delivered to Gitomer.

Gitomer filed the zoning application, and prior to the hearing attempted to settle for the lot without waiting for rezoning. When it became apparent that Gitomer expected Mrs. Kay and Mrs. Eckles to join in the deed, they attempted to exact the payment of the entire consideration in cash as the price of their joinder. When Gitomer's repeated efforts to settle for the property failed, he filed his bill for specific performance. Before the case came on for trial, the rezoning was granted.

As we see it, this appeal poses only two questions: 1. Was lot 5 owned by Kay and Eckles as tenants in partnership? 2. Did the contract of sale, signed by Kay, bind the partnership? Under our view of the case, we need not reach the other contentions advanced by the appellants, that title to the lot was held by Kay and Eckles as tenants in common and that their interests were subject to their wives' inchoate dower rights.

The Uniform Partnership Act (the Uniform Act) can be found in Maryland Code (1957, 1967 Repl. Vol.) Art. 73A. The resolution of the questions presented can be accomplished by equating the facts of this case to the pertinent provisions of the Uniform Act.

*Was lot 5 owned by Kay and Eckles as tenants in partnership?*

§ 8(1) provides:

> "All property originally brought into the partnership stock or subsequently acquired, by purchase or otherwise on account of the partnership is partnership property."

In *Williams v. Dovell*, 202 Md. 351, 96 A. 2d 484 (1953), we held that the Uniform Act does not prevent a partnership from acquiring real estate by having the partners take title as co-tenants, and in *Vlamis v. De Weese*, 216 Md. 384, 140 A. 2d 665 (1958), that where record title to real estate was in the name of the partners as tenants in common, "* * * The criterion of whether property not held in the partnership name is partnership property is the intention of the parties to devote

it to partnership purposes, to be found from the facts and circumstances surrounding the transaction considered in connection with the conduct of the parties in relation to the property." 216 Md. at 390-91. *See also, Miller v. Salabes,* 225 Md. 53, 169 A. 2d 671 (1961) ; *Price v. McFee,* 196 Md. 443, 77 A. 2d 11 (1950).

The testimony of Mr. Kay, taken at a pre-trial deposition, was read into the record below without objection :

"Q Now, Mr. Kay, what was the intention in your mind when you purchased Lot 5 in Block H in Easley's subdivision along with this other property fronting on Fenton Street in connection with the ownership of the real estate and the partnership that you had formed or were forming with your brother-in-law, B. F. Eckles?

"A We figured it would be a fairly good place to work out of in the business that we sort of hoped to develop and let's say a likely spot for maybe the appreciation of the property rather than a depreciation in its value.

"Q Well, was it your intention that the partnership of you and Mr. Eckles would have the beneficial ownership of this property ?

"A We had the use of it.

"Q Was that your intention ?

"A Oh, yes."

It was stipulated that the capital account of the partnership consisted principally of land at a cost of $38,583.62 and improvements at a cost of $15,000, which were equally reflected on the accounts of the two partners. The United States income tax return filed by the partnership for the calendar year 1960, which was an exhibit in the case, disclosed that the partnership had recognized as income $55.00 received as rent from lot 5, then used as a parking lot, and had taken as deductions $750.00 in depreciation on the frame building on lots 1 to 4, $704.66 in real estate taxes which included the taxes on lot 5, and $690.00 in interest on the mortgage on lots 1 to 4. It was stipulated that

of taxes paid by the partnership in 1961, $524.99 related to lots 1 to 4 and lot 5.

This is the evidence on which the lower court relied in finding that when Kay and Eckles took title to lots 1 to 4 and lot 5 on 18 June 1959, they intended the real estate to be the property of the partnership which they had formed. There was no necessity for it to have been purchased with partnership funds. It constituted Kay's and Eckles' contribution to partnership capital, for, in the language of the Uniform Act, it was "originally brought into the partnership stock." *Compare*, however, *Jones v. Dugan,* 124 Md. 346, 92 A. 775 (1914) where a contrary result was reached where the land was bought *prior* to the formation of the partnership, and there was no evidence that the land was put into the partnership as part of its stock.

*Did the contract of sale signed by Kay, bind the partnership?*

Having determined that Kay and Eckles held lot 5 as tenants in partnership, other results follow under the Uniform Act. § 25 (2) (e) provides, "A partner's right in specific partnership property is not subject to dower, curtesy, or allowances to widows, heirs, or next of kin." Consequently, there is no need for a partner's spouse to join in a contract of sale, instrument of conveyance or a mortgage. The fact that Mrs. Kay and Mrs. Eckles joined in the purchase money deed of trust certainly could have been occasioned by an excess of caution on the part of the lenders and not by any legal requirement.

§ 10 (4) of the Uniform Act deals with a conveyance of property not titled in the name of the partnership:

> "Where the title to real property is in the name of one or more or all the partners, * * * a conveyance executed by a partner in the partnership name, or in his own name, passes the equitable interest of the partnership, provided the act is one within the authority of the partner under the provisions of paragraph (1) of § 9."

It therefore follows that Kay's signature on the contract was all that was needed to bind the partnership, provided that he acted within the scope of § 9 (1) of the Uniform Act:

> "Every partner is an agent of the partnership for the

purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority."

In *Bradford v. Harford Bank,* 148 Md. 1, 128 A. 899 (1925) we held that a firm was bound by notes executed by one partner, without showing that he had express authority from his copartner, when the partner acted within the scope of his authority. *See also, Brocato v. Serio,* 173 Md. 374, 196 A. 125 (1938). The Uniform Act, § 4 (3) specifically incorporates the law of agency as an aid to construction. In *Phillips v. Cook,* 239 Md. 215, 210 A. 2d 743 (1965) we said:

"In a case involving a partnership, the contract of partnership constitutes all of its members as agents of each other and each partner acts both as a principal and as the agent of the others in regard to acts done within the apparent scope of the business, purpose and agreement of the partnership or for its benefit. * * * Partnership cases may differ from principal and agent and master and servant relationships because in the nonpartnership cases, the element of control or authorization is important. This is not so in the case of a partnership for a partner is also a principal, and control and authorization are generally within his power to exercise." At 219-20.

We think that the lower court was correct when it held that Kay's signature on the contract bound the partnership—not because the act was within the scope of Kay's apparent authority, since the sale of partnership real estate would ordinarily be within the apparent authority only of a partner in a firm which dealt in real estate, Crane and Bromberg, *Partnership* (1968) § 50 A at 288-90; *Harmon v. Martin,* 395 Ill. 595, 71 N.E.2d 74

(1947), but because in our view, Kay had actual authority to sign the contract. The Uniform Act, § 9 (2) provides: "An act of a partner which is not apparently for the carrying on of the business of the partnership in the usual way does not bind the partnership unless authorized by the other partners."

There was testimony from which the court could have found that Eckles, having admitted that he participated in the conversation with Urciolo on 23 November, in which an acceptable price and terms were indicated, had authorized Kay to act. *Compare*, however, the result reached in *Smith v. Dixon,* 238 Ark. 1018, 386 S.W.2d 244 (1965) which held, on almost identical facts, that the selling partner had *apparent* authority. Of even more significance is the court's finding that Eckles never actually disaffirmed the contract until suit was brought, but that the resistance came from Mrs. Eckles, who complained at the zoning hearing that the contract "needs more signatures on it", after she had arranged for the closing papers prepared by Gitomer to be examined by her counsel, who attempted to exact the payment of the purchase price in cash as a condition of Mrs. Eckles' and Mrs. Kay's joinder.

Having seen and heard the witnesses, the chancellor made a finding of fact:

"1. The defendants took title to the subject property as tenants in common on June 18, 1959.

"2. That at the time of the conveyance the defendants intended that it be partnership property.

"3. That when the contract for the sale of the property was made on November 25, 1964 the defendants were partners in a contracting business.

"4. That since 1959 the defendants not only considered the real property partnership property but reported it as such on their official tax returns, and considered it a capital asset in their partnership records.

"5. That there is a strong inference, from the conduct of the defendant partners, that Mr. Eckles did in fact authorize Mr. Kay to sign his name to the contract.

"6. That there was no fraud or misrepresentation by the plaintiff.

"7. That the plaintiff did all he was bound to do to complete settlement."

We cannot say that the result which he reached on these facts was clearly erroneous.

*Decree affirmed; costs to be paid by appellants.*